## THE NEWCASTLE.

(District Court, E. D. Pennsylvania. August 29, 1906.)

### No. 19.

SHIPPING—SINKING OF SMALL BOAT—DISPLACEMENT WAVES OF TUG.

Evidence considered and *held* not to sustain the claim of a libelant that a small boat which he was towing across the Delaware river, loaded with six tons of wheat, was sunk by the displacement waves of a passing tug, but to show by a preponderance that she was swamped and sunk before such waves reached her by waves caused by the wind, owing to being overloaded, and having too little freeboard.

In Admiralty.

Willard M. Harris, for libelant.

H. Alan Dawson, Howard H. Yocum, and J. Rodman Paul, for respondent.

J. B. McPHERSON, District Judge. The libelant is the owner and master of the gasoline launch, or power boat, the Mary S. Dalbow, and of her consort, the Captain Smith, this being a small boat without power of her own, which is towed by the launch in prosecuting the owner's business of carrying cargo upon the river Delaware. The launch is 25 feet long, 8 feet beam and 21 inches deep, partly roofed over, and her consort is an open boat 21 feet 4 inches long, 8 feet 2 inches beam and 33 inches deep. The Newcastle is a large steam tug, 86 feet long, 21½ feet beam, and draws from 8 to 9 feet of water. She is capable of a speed of about 12 miles an hour, but upon the occasion now in question she was not running at more than two-thirds of this speed. Both the launch and the tug were in charge of experienced men. The libelant had been engaged to carry 300 bushels of wheat across the river from Port Penn on the western, or Delaware bank, to Alloway creek, on the eastern, or New Jersey bank; and on October 23, 1903, he set out upon the voyage, carrying one-third of the cargo upon the launch, and two-thirds upon her consort. He was the only person upon the launch, and his brother was the only person upon the consort. Both boats were apparently in good condition. The wheat

was loaded in bags, each bag containing two bushels and weighing 120 pounds. The launch was, therefore, carrying 6,000 pounds, all of which seems to have been loaded aft, and her consort was carrying 12,000 pounds. Upon the latter, the 100 bags were piled in a row, rising in height about her gunwale at least the thickness of one bag, and were covered by a tarpaulin to protect them from water, either rain or the water of the river. The voyage was begun at Port Penn about 2 o'clock in the afternoon, and the course lay in a diagonal direction above the head of Reedy Island, and thence eastwardly across the ship channel and the rest of the river, the whole width of the stream at this point being about 2 miles, to the point of destination on Alloway creek. The tide was about high-water slack. After Reedy Island had been passed, and the ship channel had been entered upon, the "Newcastle" was discovered about a mile up the river, coming down (as afterward appeared) in company with another tug, the Juno, some distance behind her, to pull off a steamship that had run aground at the lower end of Reedy Island. At this time (between 3 and 4 o'clock) the launch and her tow were somewhat on the starboard bow of the tug, but as the launch proceeded across the river the relative position of the vessels changed, and when they were about 500 feet apart the tug was headed directly for the launch and her tow, the three vessels being then on the westerly side of the channel, in water 5 or 6 fathoms deep. In this situation, the tug very properly ported her helm and changed her course to starboard, in order to pass astern of the tow. This maneuver was successfully carried out, and the tug was about to pass at a distance of 70 or 80 feet, when the tow was seen to be in trouble. The launch stopped her engine; the libelant hastened to pull the consort up to the launch, the towing line being only about three fathoms long, the libelant's brother ran forward over the bags to the bow of the consort, and barely succeeded in getting upon the launch when the consort went down, nearly abreast of the tug's fireroom door. She remained under water a very short time, however, and then reappeared, bottom upward, having turned over under water and spilled out her cargo, and in this position the launch began at once to tow her to the point of destination. This was reached in due season, and the wheat that had been stowed upon the launch was delivered to the consignee, but the libelant avers that the lower bags, containing 36 bushels, were so wet that the grain was not even fit to be fed to chickens. This suit is brought by the master, as bailee of the cargo, to recover for the loss and damage to the wheat, on the theory that the consort was sunk, and water was forced aboard the launch, by the displacement waves of the tug, and that the latter vessel was negligent in failing to keep off, in obedience to the gestures that were made by the libelant and his brother, and in continuing her dangerous course at undiminished speed after the tow was seen to be in a position where the displacement waves would be likely to do harm.

As might be expected, the testimony as to the cause of the damage is in direct conflict. From the libelant's point of view, it would appear that the day was calm and the water smooth; that no wind was blowing and no waves were endangering the safety of his craft; that

the consort was not overloaded, but was showing a freeboard of 10 or 12 inches; and that no injury whatever would have happened if the tug, in its impatience to reach the stranded steamship before the tide should go down, had not proceeded at a reckless speed, and passed the launch and her tow so close as to sink one vessel and damage the cargo of the other by the force of her displacement waves. According to the libelant's theory, it was the second, or aft, wave that did the real damage, the bow wave merely contributing thereto by putting both boats in a perilous situation. The respondent's witnesses declare, that there was a stiff breeze blowing from the southwest, and that the waves on the river were of considerable height; that they were certainly high enough to be a source of danger to a small boat, obviously overloaded with a cargo heavier than she had ever carried before, and showing a freeboard of not more than 4 or 5 inches; that she must have been shipping water before the tug approached, and that the libelant's brother, instead of making gestures to the tug to keep off, was using his hands to work the pump; and finally, that the boat went down bow first instead of stern first, as the libelant avers— and sank before the displacement waves of the tug had reached the tow at all.

Of course, if this latter statement is true—that the consort sank before she was touched by the waves from the tug—the libelant's case fails utterly, and it is not material to consider other questions of fact, such as the height of the tug's waves, the distance from the vessel at which they meet, and their ability to do damage on a calm day and on smooth water to boats showing so high a freeboard as would appear from the libelant's testimony. Concerning the truth of this vital fact, therefore, I have carefully considered all the evidence, and have come to the conclusion that the libelant has failed to make out his case. The weight of the evidence seems to me to be against him, and to indicate that his tow was overloaded, that she was too low in the water for safety, that she encountered both wind and waves, and shipped so much water from this cause as to sink her before the tug's waves came near enough even to contribute to the injury. The consort had carried 5 tons of cargo before, with a freeboard of 8 inches; but now, with a heavier cargo, the court is asked to accept the proposition that she was showing from 2 to 4 inches more. Further, the libelant's testimony is somewhat discredited by his failure to corroborate his averment that part of the grain on the launch was injured. The consignee was available for this purpose, but he was not called, although the relevance and the importance of his testimony are clear. I have no disposition to diminish the obligation of larger vessels to exercise proper and reasonable care toward small craft, whose right upon the water is as clear as theirs, and it is common knowledge that there is too much disregard by large ships of the safety of smaller boats, but, of course, unless the damage done to the boat can be directly traced to the improper conduct of the ship, the latter cannot be held liable.

One further word concerning the alleged failure of the tug to stand by and offer assistance. The evidence satisfies me that she intended to do so, as soon as she saw the consort go down; but, when that boat

reappeared in a moment, and was promptly towed away by the launch, I do not see that the tug was under any obligation to remain and offer aid that could do no real good. No life was in danger; the cargo of the consort was past saving, and she herself was not in peril, although it was no doubt more inconvenient to tow her bottom ...pward than if she had been righted.

A decree may be entered, dismissing the libel, with costs.